57 So.2d 40

TUCKER v. CENTRAL MOTORS, Inc.

No. 40041.

Jan. 14, 1952.

Rehearing Denied Feb. 18, 1952.

---

Samuel P. Love, Kenneth Rigby, Shreveport, for plaintiff-appellant.

Garrett & Pleasant, Shreveport, for defendant-appellee.

HAMITER, Justice.

In this cause the plaintiff, Heyward S. Tucker, demands principally a rescission of the sale to him by the defendant, Central Motors, Inc., of a Dodge automobile and a refund of the purchase price paid of $2,370.04.

The petition, among other things, alleges: "That petitioner purchased said automobile only because he believed and relied upon the representations of defendant and its employees that said automobile was the latest 1949 model; that had petitioner known that a newer styled automobile was to be displayed and sold as the new model Dodge for 1949, within such a short time after he supposedly purchased the latest 1949 automobile, which was an older and different car than the now advertised newest car, he would not have made said purchase; that the consent of petitioner to the contract was induced by said false representations of the employees of defendant company."

In the alternative plaintiff seeks a reduction of $500 in the purchase price of the automobile.

The district court, after a trial of the merits, rejected both demands. This appeal followed.

In the summer of 1948, according to the record, plaintiff became interested in purchasing a new black four door Dodge sedan, and to accomplish that end he had his name placed on a lengthy waiting list maintained by the defendant, Central Motors, Inc., a Shreveport automobile dealer operating under a franchise from the Dodge Division of the Chrysler Corporation. Thereafter, from time to time he made inquiry of James Beck, a salesman for defendant, as to when he might expect a car.

On February 4, 1949, Beck telephoned plaintiff and informed him that he could obtain delivery on the automobile desired. The next morning (a Saturday) plaintiff, accompanied by his wife, went to defendant's place of business; and, after examining the car and talking with Beck, he

entered into an agreement to purchase, giving at the same time his draft for $250 payable to defendant on February 9, 1949, the designated delivery date. On the face of the draft was written: "For deposit on 1949 Dodge Custom 4 Dr Sedan."

Plaintiff returned on February 9, 1949, paid the balance ($2,120.04) of the agreed purchase price, and received the automobile. In the accompanying invoice the car was described as 1—1949 Dodge D–24 Custom 4 Door Sedan, Color—Black, Serial No. 31240303, Motor No. D24–641162.

Meanwhile, about the latter part of December, 1948, the Chrysler Corporation mailed to all Dodge dealers a bulletin announcing that the D–24 series, which had been manufactured and distributed since December 1945 (and to which plaintiff's car belonged), would be replaced during the early part of 1949 by two new series known as D–29 and D–30. Another bulletin went out under date of January 19, 1949, informing the dealers that shipments of the new models would commence during the month of February, 1949, but that the first cars shipped were to be placed on display for several days before being offered for sale.

On Sunday night, February 6, 1949, at the direction of the Chrysler Corporation, certain officials and employees of defendant went to New Orleans to attend a divisional meeting. Some expected to see the new styled Dodges while there; however, James Beck, a member of the group and the salesman with whom plaintiff dealt, testified that he did not know the exact purpose of the trip.

At the divisional meeting, held February 7, 1949, automobiles of the new series (D–29 and D–30) were viewed by the various dealers and their representatives. The cars differed materially in design from those of the D–24 series, although mechanically very little change had been made. Also, announcement was there made of the date (February 25, 1949) fixed by the Chrysler Corporation for the national showing of the new cars.

It was after the New Orleans meeting when plaintiff (February 9, 1949) paid the balance of the agreed purchase price and received delivery of the D–24 Dodge. He was not told by defendant's representatives of the manufacturing of the new and different series, concerning which they were fully aware although without definite information as to when the cars would be available for marketing. Neither did he inquire about any prospective new model.

On February 10, 1949, the following day, an article appeared in the Shreveport Journal (an afternoon daily paper) stating that representatives of the defendant had returned from New Orleans "where they attended a dealer preview of the completely new-styled Dodge cars, the first models of which will be publicly displayed at Central Motors, Inc., Lake at Market, Friday, February 25." Plaintiff read the item, and on the following day went to defendant's place of business. He expressed doubt as

to whether or not he had received a 1949 automobile, and requested that he be given a bill of sale evidencing his purchase. The sales manager executed the bill of sale and at the same time assured plaintiff that his was a 1949 car. The automobile's description in this instrument was almost identical with that contained in the above mentioned invoice.

On February 12, 1949, plaintiff addressed a letter to the Chrysler Corporation of Detroit, Michigan, in which he said in part:

"On February 9, 1949, I bought a new Dodge from Central Motors, Inc., Shreveport, Louisiana. This car was sold to me as a 1949 model. My bill of sale, register of certificate, and check I gave to pay for it all show I bought a 1949 model. Several friends have told me that my car is a 1948 model.

> \*       \*       \*       \*       \*       \*

"The motor No. on my car is D24–641162, Serial No. 31250303. Please advise me what model I own. After I hear from you and if you advise me I own a 1948 Dodge, I will contact the Central Motors, Inc., and see what they will do."

In reply the corporation wrote: "We have not, since the war, designated any of our cars as of a particular year model. To meet certain state license requirements, we have, however, designated them as of a particular years series. The information you request, should therefore be secured from your state license bureau. However, we may advise that, according to our rec-ords, Dodge car, serial number 31250303, may for registration purposes, be considered as of the 1949 series."

The new series D–29 and D–30 cars were displayed in Shreveport on February 25, 1949. But it was some time in March before they were available to defendant for marketing.

On March 30, 1949, plaintiff's attorneys sent a letter to defendant, the pertinent portions of which were as follows:

"We have been employed by Mr. Heyward S. Tucker, who purchased an automobile from your concern on or about February 8th of this year.

"Mr. Tucker tells us he was assured he was being sold the newest 1949 model, whereas, according to information received by him, he was sold a 1948 model. Incidentally, this apparently took place just one or two days before you placed the streamlined 1949 model on the floor for demonstration purposes. \*  \*  \*

"This is to request your advice as to what you propose to do about the misrepresentations of the car sold Mr. Tucker. It is not our desire to cause any unnecessary expense or embarrassment about the matter and suggest your immediate cooperation."

Shortly thereafter plaintiff drove the car to defendant's service department for the purpose of having a leaky windshield repaired, instructing that he not be called until "it is fixed". He had used the automobile continually since its purchase, often

returning it to obtain other repairs, motor adjustments, and the 1,000 mile check up (on March 8).

On receipt of a letter from defendant of date April 7, 1949, informing him that the windshield repairs had been made, plaintiff went to the company office. There and, then he proposed to return the car upon a refund of its purchase price; or to take a new model and pay the difference between the list prices of the two cars; or to keep the D–24 Dodge on defendant's paying him an amount equal to one year's depreciation. This appears to have been his first offer to return the car, as well as his first request for a rescission of the sale, although he had previously indicated that he was not entirely satisfied with his purchase (through his attorneys' letter of March 30 and also through a question addressed to the salesman Beck, on one occasion while the automobile was being serviced, of why he was not told that the new model was coming out).

The defendant having rejected the proposals, this suit was filed April 22, 1949. Thereafter, plaintiff continued to use the car, the speedometer of which at the time of the trial in February, 1950 showing its having been driven over 11,000 miles.

For obtaining the rescission of the sale and the return of the purchase price plaintiff invokes the provisions of Civil Code Article 1819, reading:

"Consent being the concurrence of intention in two or more persons, with regard to

a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by—

"Error;

"Fraud; * * *."

Contrary to the belief expressed in his letter to the Chrysler Corporation and also in his attorneys' communication to defendant (that he was delivered a 1948, instead of the promised 1949, automobile), plaintiff did receive a 1949 Dodge of the latest model then available, such as the defendant represented it to be. His car was actually assembled on January 24, 1949; it, along with nine other cars of the D–24 series, was received in Shreveport from the Chrysler Corporation on February 2, 1949; and the new series (D–29 and D–30) were not shipped to defendant for marketing until about the middle of March, 1949.

However, plaintiff now complains that defendant's representatives, having knowledge of the manufacturing of the new series cars although not knowing when they could be marketed, should have informed him during their negotiations that drastically changed models were then being processed, thus affording him the opportunity of waiting for and securing an automobile of the latest design. And in connection with this complaint his counsel direct at-

tention to the testimony of a defense witness, the Studebaker dealer in Shreveport, that under the same circumstances he would have felt it his duty to give plaintiff the information. (The witness also said, apparently in qualification of that testimony, that in 1949 there was no hardship in selling automobiles because of a shortage of them.)

In deciding this case it appears unnecessary to determine whether or not defendant's failure to make a disclosure of such information to plaintiff during their negotiations constituted sufficient ground for having the sale rescinded. Assuming for the sake of argument that it did, clearly plaintiff has since lost his right to rescission.

■ To obtain that relief a purchaser must seek to restore the status quo as near as possible. Within a reasonable time after learning of the vice of which he complains he must offer to return the purchased article. Ehrlich v. Roby Motors Company, Inc., 166 La. 557, 117 So. 590; Barnidge v. Cappel Motor Company, 12 La.App. 216, 125 So. 778; Goode-Cage Drug Company v. Ives, 16 La.App. 383, 133 So. 813; Twin City Motor Company, Inc., v. Pettit, La. App., 177 So. 814; Cleaners Equipment Corporation v. Weil Cleaners, Inc., La. App., 178 So. 771; American Furnace Company v. Great Southern Air Conditioning Company, La.App., 16 So.2d 140.

[2] This plaintiff entered into the agreement with defendant on February 5, 1949, and the sale to him was completed four days later. On February 10, 1949, he learned, through the mentioned news item, of the trip to New Orleans by defendant's representatives and of the processing of the new styled Dodges. Yet he waited until after April 7, 1949, or almost two months, before offering to return the automobile. As a result of this long delay, manifestly unreasonable, the status quo could not be restored, the car having been driven during the period much in excess of 1,000 miles. The action to rescind, therefore, cannot succeed.

■ Under his alternative demand for a reduction of $500 in the purchase price, plaintiff seems to contend that the value of his car depreciated at least that much upon the public announcement, the displaying, and the marketing of the new models. But the demand is not sufficiently proved. If some depreciation resulted, the record contains no evidence whatever to show the extent thereof. The testimony of defendant's representatives, on the other hand, is that there was no competitive automobile market in February, 1949, and that all cars obtainable of the D–24 series could have been sold then at list price. Further, they said that after January 1, 1949, they received and sold 37 cars of such series without granting any discount, the sales of four of which occurred after plaintiff's purchase and after the public announcement of February 10.

For the reasons assigned the judgment appealed from is affirmed.